## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Southern Glazer's Distributors
of Ohio, LLC,

       Plaintiff,               Case No. 2:16–cv–861

       v.                    Judge Michael H. Watson
                             Magistrate Judge Deavers

The Great Lakes Brewing
Company, *et al.*,

       Defendants.

### OPINION AND ORDER

Plaintiff Southern Glazer's Distributors of Ohio, LLC ("Plaintiff") moves for a temporary restraining order ("TRO") and preliminary injunction prohibiting Defendant The Great Lakes Brewing Company ("Great Lakes") from terminating or altering its franchise relationship with Plaintiff, a franchisee that is the exclusive distributor of certain Great Lakes brands in central Ohio. Mot. TRO, ECF No. 3. Following an informal conference with the Court pursuant to S.D. Ohio Civ. R. 65.1, Great Lakes filed a memorandum in opposition to Plaintiff's motion. Resp., ECF No. 9. On September 19, 2016, the Court held a hearing on Plaintiff's motion, Order, ECF No. 13, after which the parties filed closing briefs. ECF Nos. 14 and 15. For the reasons that follow, Plaintiff's motion, ECF No. 3, is **GRANTED**.

# I.    BACKGROUND

## A.    Preliminary Matters

On September 22, 2016, Plaintiff filed an amended complaint, naming

three additional manufacturers as defendants:  The Boston Beer Company, Inc.,

Boston Beer Corporation, and Boston Brewing Company, Inc. (collectively, "the

new Defendants").  Am. Compl., ECF No. 17.  On the same day, Plaintiff filed a

a second motion for temporary restraining order and preliminary injunction as to

Great Lakes as well as to the new Defendants.  Second Mot. TRO, ECF No. 18.

To the extent that Plaintiff's second motion relates to Great Lakes, that request

for emergency injunctive relief is addressed *infra*.[1]

However, the Court declines to bootstrap the new Defendants to Plaintiff's

first motion for emergency injunctive relief, ECF No. 3, without first affording them

the procedural rights and protections provided under Federal Rule of Civil

Procedure 65.  Accordingly, any decision on Plaintiff's second motion, ECF No.

18, will be addressed by separate order.

## B.    The Franchise Agreement

This action arises out of Great Lakes' decision to terminate (effective

September 25, 2016) its franchise relationship with Plaintiff in alleged violation of

the Ohio Alcoholic Beverage Franchise Act, O.R.C. §§ 1333.82–1333.87 ("the

---

[1] In Plaintiff's second motion, ECF No. 18, Plaintiff raises additional arguments in support of its requested injunction against Great Lakes. *See id.*  The Court, however, will disregard these arguments that were filed without leave and are an improper attempt to expand the briefing on Plaintiff's first motion.

Ohio Franchise Act"), which governs the contractual relationships between beer distributors and manufacturers. In order to understand that franchise relationship as well as the present dispute that arises from a transaction that threatens that relationship, the Court provides the following background. Great Lakes is a family-owned brewing manufacturer with its principal place of business in Cleveland, Ohio. Conway Aff. ¶ 2, ECF No. 9-1.[2] Great Lakes was the first craft brewer in Ohio and sells beer primarily in the Great Lakes region with 67% of its sales in Ohio. *Id*. at ¶ 3.

In or before 1999, Robins Wine & Spirits, Inc. ("Robins") distributed beer for Great Lakes in Ohio. Am. Compl. ¶¶ 17–18, ECF No. 17. In 1999, Glazer's Distributors of Ohio, Inc. ("Glazer's Ohio") acquired Robins and began distributing beer for Great Lakes in the Ohio territories in which Robins had previously distributed Great Lakes beer. *Id*. at ¶ 18. Glazer's Ohio's principal place of business was 4800 Poth Road, Columbus, Ohio ("the Columbus Branch"). Am. Compl. Ex. 1, PAGEID # 15, ECF No. 17-1. Glazer's Ohio was a fully-owned subsidiary of Glazer's, Inc., a multistate wine, spirits, and beer distributor headquartered in Dallas, Texas. Conway Aff. ¶ 4, ECF No. 9-1; Roberts Decl. ¶ 18, ECF No. 3-2.[3] In particular, Glazer's, Inc. had a beer distribution business that sold ten million cases of beer each year, which made it

---

[2] Daniel J. Conway is the co-founder and co-owner of Great Lakes. *Id*. at ¶ 2.
[3] John Roberts is Plaintiff's President. *Id*. at ¶ 1.

one of the largest MillersCoors distributors in the United States. Conway Aff. ¶ 9, ECF No. 9-1.

On or around September 14, 2006, Great Lakes entered into a Sales & Distribution Agreement with Glazer's Ohio for the distribution of Great Lakes beer brands. Am. Compl. Ex. 1, ECF No. 17-1 ("the Franchise Agreement"). Under the Franchise Agreement, Glazer's Ohio was the exclusive distributor of the Great Lakes brands within the Ohio territory described in the agreement. *Id*. The initial term of the Franchise Agreement was two years but would automatically renew for additional terms of one year unless a party notified the other of its intent not to renew:

> **1. TERM**
> This Agreement becomes effective on **September 14, 2006** and shall continue in force for two years (the "Initial Term"), or until terminated in accordance with Section 10 below. At the end of the Initial Term, this Agreement shall automatically renew for additional terms of one year each (each a "Renewal Term") unless either party notifies the other of its intent not to renew this Agreement by providing the other with written notice of non-renewal not less than 60 days prior to end of the Initial Term or any Renewal Term.

Franchise Agreement PAGEID # 302, ECF No. 17-1 (emphasis in the original).

Under the Franchise Agreement, Great Lakes must consent in writing to any change in the ownership of Glazer's Ohio:

> **9. OWNERSHIP CHANGES & ASSIGNMENTS**
>
> a. Wholesaler [Glazer's Ohio] must obtain GLBC's [Great Lakes'] prior written consent to any change in the ownership of Wholesaler (an "Ownership Change"), including: (i) any sale or transfer of more than 20% of the outstanding voting shares in Wholesaler or a

change in partnership interests representing more than 20% of the business; (ii) any change, whether by one transaction or a series of transactions, having the practical effect of changing or transferring the power to determine Wholesaler's business policies; (iii) a sale of all or a significant portion of Wholesaler's assets, or (iv) a change that would require Wholesaler's notification to TTB [the Alcohol & Tobacco Tax & Trade Bureau] of a change in ownership under the provisions of 27 C.F.R. § 1.42 or a successor regulation.

*Id.* at PAGEID ## 307–08 (emphasis in the original). Under Section 9(d), Great Lakes "must not unreasonably withhold its consent to an Ownership Change[.]"

*Id.* at PAGEID # 308. Great Lakes may consider certain factors in evaluating a proposed ownership change, including:

    i.    The alignment of the Territory with the territories of other distributors of the Products.

    ii.   The record of the proposed owner(s) or assignee(s) in distributing the Products in other places or at other times elsewhere.

    . . . .

    iv.   The business and financial capabilities of the proposed owner(s) or assignee(s) when compared with the capabilities of other distributors capable of serving the Territory. . . .

*Id.*

Great Lakes "may initiate the termination of this Agreement for cause at any time if Wholesaler fails to substantially comply with any of its obligations under this Agreement[.]" *Id.* at PAGEID # 309 (Section 10(b) of the Franchise Agreement). Great Lakes may also terminate the Franchise Agreement when a change of ownership occurs without prior written consent by Great Lakes:

**10.    TERMINATION**

. . . .

b.    GLBC [Great Lakes] may also terminate this Agreement for cause immediately upon written notice upon the occurrence of certain causes not subject to cure, including any of the following:

. . . .

v.    Wholesaler undertakes an Ownership Change or Assignment without the written consent required by Section 9.

*Id.* at PAGEID ## 308–09 (emphasis in the original).

The Franchise Agreement further acknowledged that, to the best of the signatories' knowledge, its terms complied with all applicable laws:

**12.    DISPUTES & GOVERNING LAW**
. . . .
b.    Any and all disputes arising our [sic] of or related to this Agreement shall be resolved under the valid and enforceable laws of the Territory, irrespective of choice-of-law principles.  The parties acknowledge and agree that to the best of their knowledge, the terms of this Agreement comply with all applicable laws, regulations and rulings.  In the event that any provision of this Agreement is deemed illegal or unenforceable, that conclusion shall not affect the enforceability of the remainder of this Agreement.

*Id.* at PAGEID # 311 (emphasis in the original).

There is no dispute that the Franchise Agreement remained in effect at the time this action was filed.

**C.    The Transaction Between Glazer's, Inc. and Southern Wine & Spirits of America, Inc.**

Case No. 2:16-cv-861                                                    Page 6 of 33

In late 2015, the alcohol beverage industry trade press reported of the possible merger between Glazer's, Inc. and Southern Wine & Spirits of America LLC ("Southern"), which, at that time, was the largest distributor of wine, spirits, and beer in the United States. DeCelle Aff. ¶ 3, ECF No. 9-2.[4] In January 2016, Glazer's, Inc. and Southern formally announced that they would combine businesses in the second quarter of 2016 ("the Transaction"). *Id.* at ¶ 4; Am. Compl. ¶ 38, ECF No. 17.

On May 2, 2016, Great Lakes, through Attorney DeCelle, contacted Glazer's, Inc. regarding the plans for Glazer's Ohio in light of the upcoming Transaction. DeCelle Aff. ¶ 6, ECF No. 9-2. Counsel for Glazer's Ohio, Alan Greenspan, confirmed that Glazer's, Inc. and Southern "are moving forward with plans to combine our businesses. The combination of our industry-leading, family-owned organizations will result in the creation of Southern Glazer's Wine and Spirits, LLC ("Southern Glazer's")." Roberts Decl. Ex. 2 PAGEID # 93, ECF No. 3-2. Attorney Greenspan assured Great Lakes that "we expect no change or disruption in service in Ohio. The transaction will not impact the local operations in any significant manner, except to improve them where possible." *Id.* Attorney Greenspan also explained the structure of the Transaction, including the transfer of membership interests:

---

[4] Arthur J. DeCelle ("Attorney DeCelle") is an attorney from the law firm of McDermott Will & Emery LLP who has represented Great Lakes for several years, including during all relevant times identified in his affidavit. *Id.* at ¶ 2.

In terms of the specific legal steps in Ohio, we expect that Glazer's Distributors of Ohio, Inc., the entity that currently holds the franchise rights with Great Lakes, will convert in late June to an Ohio limited liability company. . . .

Shortly following the conversion, Glazer's, Inc., the parent of the limited liability company, will contribute the membership interests in the converted company to Southern Glazer's. This transfer of equity interests from one entity to another will not result in any changes to the franchise rights. *See* Ohio Rev. Code § 1333.84(F); *Jameson Crosse, Inc. v. Kendall-Jackson Winery, Ltd.*, 917 F. Supp. 520 (N.D. Ohio 1996). The converted company will then change its name to Southern Glazer's Wine and Spirits of Ohio, LLC and will be a wholly owned subsidiary of Southern Glazer's.

*Id.* at PAGEID # 93–94. Attorney Greenspan concluded that "the pending transaction does not open the Ohio franchise and Great Lakes' consent is not necessary." *Id.* at PAGEID # 94.

In a letter dated May 27, 2016, Great Lakes advised that it accepted Attorney Greenspan's letter dated May 11, 2016 "as notice of an ownership change or assignment and a change in control of the distribution rights for the Great Lakes brands as defined in" the Franchise Agreement. Roberts Decl. Ex. 3, PAGEID # 96, ECF No. 3-2. While converting Glazer's Ohio from a corporation to a limited liability company "does not appear to be an issue[,]" "[t]he steps following the conversion, in which Glazer's, Inc. will contribute the membership interests in the new Southern-Glazer's Wine and Spirits of Ohio, LLC to Southern Glazer's, constitute a change in ownership as defined in Section 9(a) of" the Franchise Agreement. *Id.* "The merger of Glazer's with a larger entity also appears to be a change of control." *Id.* Great Lakes went on to refer

to its right to terminate under Section 10(c)(v) of the Franchise in the event of an ownership change without its prior written consent. *Id.* Distinguishing the case of *Jameson Crosse*, Great Lakes advised that it "withholds consent to the change in ownership pursuant to its contract[.]" *Id.* at PAGEID # 97. "While Great Lakes reserves the right to terminate the Agreement for cause upon the change in ownership and control, we would like to explore other alternatives consistent with our mutual business interests." *Id.* Thereafter, Great Lakes continued to discuss the anticipated transaction with Plaintiff. Roberts Decl. ¶ 25, ECF No. 3-2.

On June 17, 2016, Great Lakes advised Attorney Greenspan that it had received a form notice addressed to "Valued Supplier," DeCelle Aff. Ex. 6, ECF No. 9-10, which "substantiated the fact the changes occurring [with the anticipated transaction] meet the definitions for change in ownership under the Franchise Agreement." DeCelle Aff. ¶ 10, ECF No. 9-2.

In connection with but prior to the closing of the Transaction, Glazer's Ohio converted from a corporation to a limited liability company and changed its name to "Glazer's Distributors of Ohio, LLC" on June 21, 2016. Roberts Decl. ¶¶ 19, 34, ECF No. 3-2. As part of the Transaction, Southern would change from a Florida corporation to a Delaware limited liability company and change its name to "Southern Glazer's Wine and Spirits, LLC." *Id.* at ¶ 18. Glazer's, Inc. "then contributed all of the membership interests in Glazer's Distributors of Ohio, LLC to Southern Glazer's Wine and Spirits, LLC," which became "the new parent

entity after the" Transaction. *Id.*; Am. Compl. ¶ 44, ECF No. 17. Glazer's Distributors of Ohio, LLC then changed its name to Southern Glazer's Distributors of Ohio, LLC (which is Plaintiff in this case). Roberts Decl. ¶ 19, ECF No. 3-2. In exchange for contributing its membership interests, Glazer's, Inc. received stock in Southern. *Id.* at ¶ 18. The Transaction closed on June 30, 2016. *Id.*

In short, following the Transaction, Plaintiff is an Ohio limited liability company with its principal place of business in Columbus, Ohio with all of its membership interests held by Southern Glazer's Wine and Spirits, LLC, a Delaware limited liability company. Am. Compl. ¶ 1, ECF No. 17. None of Southern Glazer's Wine and Spirits, LLC's members is a citizen of Ohio. *Id.* Plaintiff, which now operates the Columbus Branch previously operated by Glazer's Ohio, did not dispose of any assets in connection with the Transaction and did not sell or transfer its franchise for the Great Lakes brands. Roberts Decl. ¶ 20, ECF No. 3-2.

**D.  Communications and Operations After the Transaction**

In a letter addressed to Plaintiff's counsel dated July 26, 2016, with the subject "Notice of Termination of 2006 Sales and Distribution Agreement between Great Lakes Brewing Company and Glazer's Distributors of Ohio, Inc." Great Lakes advised that the Franchise Agreement and applicable Ohio law

authorized it to terminate the Franchise Agreement effective September 25, 2016:

> Failure to obtain the consent of Great Lakes prior to the closing of the transactions that created Southern Glazer's constitutes a breach of Section 9 of our Agreement that is not subject to cure under Section 10(b) and therefore constitutes just cause for termination of the Agreement under the Ohio Alcoholic Beverages Franchise Act (OABFA), O.R.C. § 1333.82 *et seq.*  In fact, the principle of prior consent of a manufacturer to a change in ownership of a wholesaler is expressly set out in OABFA with the proviso that the manufacturer cannot unreasonably withhold consent, O.R.C. § 1333.84(F).  Since Glazer's asserted its right to conclude the transaction with Southern Wine & Spirits without requesting consent from Great Lakes, no opportunity existed for Great Lakes to exercise its reasonable business judgment and to reasonably withhold consent as required by Section 9(d) of the Agreement and OABFA.  Great Lakes had a reasonable basis to withhold consent to the proposed Glazer's merger with Southern under the criteria in Section 9(d) of the Agreement, and Great Lakes attempted to work out a transition and sale of the distribution rights to a new distributor.  For these reasons, Great Lakes has the right under the Agreement and under Ohio law to terminate the Glazer's franchise.

> . . . .

> Accordingly, Great Lakes hereby terminates the Agreement as of the date [of] this letter.  If an Ohio court determines that the sixty day statutory notice and cure period under OABFA, O.R.C. § 1333.85, or the sixty day notice period established in Section 10(b) of the Agreement applies, then the Agreement shall terminate on September 25, 2016.

> Great Lakes further asserts and provides notice of its right to terminate the Agreement on September 25, 2016, pursuant to Section 10(d) and upon payment of Reasonable Compensation as defined in the Agreement.

Roberts Decl. Ex. 4, PAGEID ## 100–101, ECF No. 3-2.

On July 26, 2016, Sheldon Stein, current President of Southern Glazer's and President and CEO of Glazer's, Inc. before the Transaction, spoke on the telephone with Bill Boor, CEO of Great Lakes, regarding Great Lakes' decision to terminate its franchise with Plaintiff. Stein Decl. ¶¶ 1–2, ECF No. 15-3. During that call, Messrs. Stein and Boor "agreed that the parties would have a subsequent meeting to try to resolve their dispute, and that Great Lakes would not proceed with its termination plans while the parties were engaged in those discussions." *Id.* at ¶ 2. On or around the same day, Attorney Greenspan, Southern Glazer's Executive Vice President and General Counsel, learned that Mr. Boor had agreed in principle to a standstill pending the parties' settlement discussions. Greenspan Decl. ¶¶ 1, 3, ECF No. 15-4. On August 4, 2016, however, Great Lakes' counsel, Attorney DeCelle, advised that he was unaware of any standstill agreement and would have to check with Great Lakes and get back with Attorney Greenspan. *Id.* at ¶ 4; DeCelle Aff. ¶ 17, ECF No. 9-2.

Thereafter, Attorney DeCelle sent a letter to Attorney Greenspan detailing a transition process in light of the upcoming termination. DeCelle Aff. ¶ 18, ECF No. 9-2; Resp. Ex. B-10, ECF No. 9-15. Attorney Greenspan acknowledged receipt of that letter. *See* DeCelle Aff. ¶ 18, ECF No. 9-2; Resp. Ex. B-11, ECF No. 9-16. However, during several telephone calls with Attorney DeCelle "regarding the Southern-Glazer's transaction and its potential impact on Southern Glazer's of Ohio's franchise with Great Lakes . . . Mr. DeCelle "led me [Attorney

Greenspan] to believe that Great Lakes would negotiate regarding any potential termination of the franchise." Greenspan Decl. ¶ 5, ECF No. 15-4.

On September 1, 2016, Mr. Greenspan advised Mr. DeCelle that while Plaintiff continued to believe that Great Lakes' consent to the Transaction was not required, Plaintiff nevertheless then requested such consent and offered to provide information "regarding the Southern-Glazer's combination and its impact (or lack of impact) on the distribution of Great Lakes[.]" Resp. Ex. B-11 PAGEID # 217, ECF No. 9-16. On the same date, Great Lakes, through Bridget Barrett, also emailed Plaintiff through John Roberts to confirm transition plans. Boor Aff. ¶ 8, ECF No. 9-3.

Mr. DeCelle responded to Mr. Greenspan on September 7, 2016, repeating Great Lakes' intention to proceed with termination and asking Plaintiff to respond regarding the transition process. DeCelle Aff. ¶ 20, ECF No. 9-2; Resp. Ex. B-12, ECF No. 9-17.

On September 8, 2016, Plaintiff filed the instant action, alleging that Great Lakes acted in bad faith by using the Transaction (and withholding its consent to the Transaction) as a purported basis to terminate, effective September 25, 2016, its franchise with Plaintiff and seeking declaratory and injunctive relief. Am. Compl., ECF No. 17. On the same day, Plaintiff moved for a TRO and preliminary injunction, seeking an order prohibiting Great Lakes from doing any of the following:

    (1)     Terminating, altering, or interfering with its franchise relationship or contact with Plaintiff;

    (2)     Withholding the delivery of beverages ordered by Plaintiff;

    (3)     Changing or altering Plaintiff's exclusive sales territory; and

    (4)     Taking any action to appoint any person or entity as a distributor to replace Plaintiff in its exclusive sales territory.

Mot. TRO 1, ECF No. 3.[5]

Following an informal conference with the Court pursuant to S.D. Ohio Civ. R. 65.1, Great Lakes filed a memorandum in opposition to Plaintiff's motion. Resp., ECF No. 9.[6] On September 19, 2016, the Court held a hearing on Plaintiff's motion ("the Hearing"). Order, ECF No. 13. Following the Hearing, the parties filed closing briefs. ECF Nos. 14 and 15. This matter is now ripe for resolution.

## II.    STANDARD

Plaintiff seeks injunctive relief pursuant to Federal Rule of Civil Procedure 65. "'The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th

---

[5] Plaintiff's motion and supporting memorandum, which exceed twenty pages, was filed without leave of Court in violation of the Undersigned's Standing Order, p. 2. The Court advises Plaintiff to familiarize itself with the Standing Order and ensure that future filings comply with that Order.

[6] Great Lakes likewise violates the Undersigned's Standing Order, p. 2, by exceeding the twenty-page limitation without leave of Court and is also advised to review the Local Rules and the Undersigned's Standing Order and ensure future filings are compliant.

Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). In light of this limited purpose, the movant "'is not required to prove his case in full'" at this stage. *Id.* (quoting *Camenisch*, 451 U.S. at 395).

In determining whether to grant such injunctive relief, the Court considers four factors: (1) whether the movant has established a substantial likelihood of success on the merits; (2) whether there exists the threat of irreparable harm to the movant in the absence of an injunction; (3) whether an injunction would substantially harm third parties; and (4) whether an injunction would serve the public interest. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). The factors are not prerequisites; rather, they must be balanced in weighing the equities involved. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004). "Whether a preliminary injunction should be granted is a decision left to the sound discretion of the district court." *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 782 (6th Cir. 2005).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.1997). Because the movant is not required to prove its case in full at this stage, however, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so

serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id*.

In considering whether Plaintiff has a strong likelihood of success on the merits under the Ohio Franchise Act, this Court applies Ohio law. *Tri-Cty. Wholesale Distribs., Inc. v. Wine Grp., Inc.*, No. 10–4202, 565 F. App'x 477, at *480–81 (6th Cir. June 29, 2012). The Ohio Franchise Act requires written franchise agreements and explains that contract provisions that waive or violate the Act are void:

> Every manufacturer of alcoholic beverages shall contract with or offer in good faith to its distributors a written franchise providing for, and specifying the rights and duties of both parties in effecting, the sale of the specified brands or products of the manufacturer. Any provision of a franchise agreement that waives any of the prohibitions of, or fails to comply with, sections 1333.82 to 1333.87 of the Revised Code is void and unenforceable.

O.R.C. § 1333.83.

However, in the absence of a written contract, a manufacturer's and distributor's course of conduct may create a franchise:

> When a distributor of beer or wine for a manufacturer, or the successors or assigns of the manufacturer, distributes the beer or wine for ninety days or more without a written contract, a franchise relationship is established between the parties, and sections 1333.82 to 1333.87 of the Revised Code apply to the manufacturer, its successor or assigns, and the distributor.

O.R.C. § 1333.83.

The Ohio Franchise Act also identifies the consequences of failing to act in good faith or without just cause:

> Notwithstanding the terms of any franchise, no manufacturer or distributor engaged in the sale and distribution of alcoholic beverages, or a subsidiary of any such manufacturer, shall:
>
> (A) Fail to act in good faith or without just cause in acting or purporting to act under the terms of a franchise or in cancelling or failing to renew a franchise;
>
> . . . .
>
> (F) Refuse to recognize the rights of surviving partners, shareholders, or heirs and fail to act in good faith in accordance with reasonable standards for fair dealing, with respect to the distributor's right to sell, assign, transfer or otherwise dispose of the distributor's business, in all or in part, except that the distributor shall have no right to sell, assign, or transfer the franchise without the prior consent of the manufacturer, who shall not unreasonably withhold the manufacturer's consent.

O.R.C. § 1333.84(A) and (F).

The Ohio Franchise Act goes on to prohibit "manufacturers from terminating a franchise 'for other than just cause.'" *Tri-Cty. Wholesale Distributors, Inc. v*, 565 F. App'x 477, at *481 (quoting O.R.C. § 1333.85). The Franchise Act, however, does not define the term "just cause." *Id*.

In the case presently before the Court, the parties agree, notwithstanding certain representations by Great Lakes' counsel during the Hearing, that Great Lakes' present attempt to terminate the Franchise Agreement is not because of any alleged past performance issues by Plaintiff. *See* P's Closing Brief 2, ECF No. 15; Great Lakes Closing Brief 8, ECF No. 14. Instead, the parties dispute

whether the Transaction, particularly the change in Plaintiff's ownership,[7]

provided "just cause" to Great Lakes to terminate the Franchise Agreement.

After reviewing the relevant law and the arguments of counsel, this Court

concludes for the reasons that follow that Plaintiff has "raised serious questions

going to the merits of its claims, sufficient to justify the issuance of a preliminary

injunction." *Six Clinics Holding Corp.*, 119 F.3d at 402.

As set forth *supra*, Sections 9(a) and 10 of the Franchise Agreement

provide that Plaintiff's failure to obtain Great Lakes' prior written consent before

effecting an ownership change authorizes Great Lakes to terminate the

franchise. Great Lakes contends that because Plaintiff failed to obtain prior

written consent to proceed with the Transaction, just cause exists and Great

Lakes validly terminated under the Franchise Agreement. Plaintiff, however,

argues that lack of manufacturer consent to a change of ownership does not

constitute just cause under the Ohio Franchise Act and, to the extent the

Franchise Agreement permits otherwise, those contract provisions are void. In

so arguing, Plaintiff relies on *Jameson Crosse, Inc. v. Kendall-Jackson Winery,

Ltd.*, 917 F. Supp. 520 (N.D. Ohio 1996). In that case, there was no written

agreement between the manufacturer and distributor. *Id*. at 521. One distributor,

Jameson Crosse, sold all of its stock to another distributor, The Hammer

---

[7] The parties do not dispute that there was an ownership change. *See*, *e.g.*, P's Closing Brief 2, ECF No. 15; Great Lakes Closing Brief 5, ECF No. 14.

Company ("Hammer").  *Id*.  Jameson Crosse and Hammer decided not to liquidate Jameson-Crosse and consolidate the two distributors.  *Id*. at 523.  That decision "was made in part to enable Jameson Crosse to continue its franchise relationship with Kendall-Jackson[,]" one of Jameson Crosse's fastest-growing suppliers.  *Id*.  Nevertheless, Kendall-Jackson objected to the stock sale and advised that the change in ownership without its consent violated the Ohio Franchise Act and was grounds for termination of the agreement.  *Id*.

In determining whether such grounds existed, the *Jameson Crosse* court considered O.R.C. § 1333.84(F).  That section, in relevant part, distinguishes between a "business" and a "franchise:  A manufacturer is required to act in good faith regarding "the distributor's right to sell, assign, transfer or otherwise dispose of his *business*, in whole or in part, except that the distributor shall have no right to sell, assign, or transfer the *franchise* without the prior consent of the manufacturer . . . " (emphasis added).  Reading this language, the *Jameson Crosse* court observed that "[t]his provision makes a subtle but critical distinction.  While a distributor may dispose of its 'business' without manufacturer consent, it has no such unrestrained freedom with regard to disposing of its 'franchise.' Disposition of the franchise is not permitted without the consent of the manufacturer."  *Jameson Crosse, Inc.*, 917 F. Supp. at 524.  That court went on to reason that "[h]ad the Ohio legislature wished to require manufacturer consent for the sale of a controlling portion of a distributor's stock, it could have done so."

*Id*. at 525 (noting that the Ohio legislature adopted such a requirement in the context of motor vehicle franchise relationships).  In considering Jameson Crosse's sale of stock to Hammer, "[t]he sale of a majority interest in stock is not a sale, assignment, or transfer of a franchise agreement. Notwithstanding the stock sale, the franchise at all times remained the property of Jameson Crosse." *Id*.  "Accordingly, Jameson Crosse did not need Kendall–Jackson's consent, prior or otherwise, for the sale of a majority interest in its stock.  Kendall–Jackson's disapproval of the sale did not constitute legal justification for terminating the franchise." *Id*.  Because Kendall-Jackson did not present grounds for termination under the Ohio Franchise Act, its attempted termination of the franchise violated that Act. *Id*.

While *Jameson Crosse*, a decision from the United States District Court for the Northern District of Ohio (authored by distinguished colleague, the late Honorable David D. Dowd, Jr.), is not binding, this Court finds it persuasive. Here, as detailed above, Plaintiff did not sell any assets in the Transaction or transfer the franchise.  Roberts Decl. ¶¶ 20–21, ECF No. 3-2.  Although Glazer's Ohio, the entity that entered into the Franchise Agreement with Great Lakes, changed from a corporation to a limited liability company prior to the Transaction's closing date, Great Lakes admits that this conversion "does not appear to be an issue."  Roberts Decl. Ex. 3, PAGEID # 96, ECF No. 3-2. Similarly, Great Lakes does not focus on the name change as legally significant.

Indeed, the Transaction did not affect daily operation of the Columbus Branch or the distribution of the Great Lakes brands:

> The Great Lakes Brands continue to be distributed from the Columbus Branch. The same equipment and facilities are used to receive and ship the Great Lakes Brands at the Columbus Branch. Virtually all of the same employees continue to work for Southern Glazer's of Ohio—the only changes in personnel have been ordinary retirement, promotion, hiring, and employee migration unrelated to the Southern-Glazer's Transaction.

Roberts Decl. ¶ 21, ECF No. 3-2. Accordingly, based on the present record, the Court cannot say that the franchise did not remain the property of Plaintiff or that the Transaction constituted a sale, assignment, or transfer of the Franchise Agreement providing just cause for termination under the Ohio Franchise Act. *Jameson Crosse*, 917 F. Supp. at 525.[8]

Great Lakes, however, contends that *Jameson Crosse* is distinguishable for two reasons. First, the franchise in *Jameson Crosse* arose by operation of law whereas here the parties here have a written Franchise Agreement that defines just cause. According to Great Lakes, nothing in *Jameson Crosse* prevented the parties in this case from further defining the statutory terms. *See also Bellas Co. v. Pabst Brewing Co.*, No. 11-3417, 492 F. App'x 553, at *557 (6th Cir. July 11, 2012). Specifically, Sections 9(a) and 10(c)(v) of the Franchise Agreement define just cause for termination as including failing to seek Great

---

[8] Any factual or legal conclusions made at this stage are not binding at a trial on the merits. *See, e.g., Anderson v. Kelley*, No. 92-6663, 12 F.3d 211, at *5 (Table) (6th Cir. Dec. 15, 1993).

Lakes' consent for a change in *ownership*. Great Lakes therefore takes the position that, unlike the manufacturer in *Jameson Crosse*, it had a right to terminate the franchise under the plain terms of the written Franchise Agreement for change of ownership.

Plaintiff responds that the Franchise Agreement impermissibly attempts to broaden the scope of prohibited action in O.R.C. § 1333.84 from a prohibition against transferring a *franchise* without a manufacturer's consent to a prohibition against transferring *ownership* of the distributor without the manufacturer's consent. Relying on *Jameson Crosse*'s interpretation of the Ohio Franchise Act, Plaintiff contends that a manufacturer's lack of consent to a change in *ownership* is not legal justification for terminating a franchise. Plaintiff therefore argues that to the extent the Franchise Agreement attempts to take the opposite position, that agreement conflicts with the Ohio Franchise Act and is "void and unenforceable" under O.R.C. § 1333.83. Plaintiff further notes that the purpose of the Ohio Franchise Act is to stop manufacturers' unfair business practices and that to permit Great Lakes to expand its termination rights would undermine the General Assembly's purpose in enacting the Ohio Franchise Act and O.R.C. § 1333.83. Resp. 15, ECF No. 3-1.

While the Court has misgivings about Plaintiff's argument that certain provisions of the Franchise Agreement are void and unenforceable under *Jameson Crosse*'s reading of the Ohio Franchise Act, Plaintiff need not prove its

case in full at this stage. Plaintiff has raised serious questions as to the validity

of these provisions. Indeed, Great Lakes concedes that the Ohio Franchise Act

violates, or likely violates, at least one provision–although not a provision

currently disputed by the parties–in the Franchise Act. More specifically, Great

Lakes acknowledged at the Hearing that the severability in the Franchise

Agreement would likely apply to Section 10(d) of the Franchise Agreement,

which permits Great Lakes to terminate the Franchise Agreement for any reason

or no reason at all by providing at least 60 days written notice agreeing to pay

"Reasonable Compensation" for the loss of the Great Lakes business.[9] This

---

[9] That provision provides as follows:

> d.    GLBC may also terminate this Agreement for any reason or no reason at all by providing Wholesaler with a written notice agreeing that Wholesaler shall receive Reasonable Compensation for its loss of GLBC's business as set forth below and establishing an effective date of termination that is at least 60 days after the date of GLBC's notice of termination. The parties recognize and agree that it would be extremely difficult to ascertain the actual economic effects, if any, that a termination could have on Wholesaler, as such effects would encompass Wholesaler's loss of future profits and the fair market value of Wholesaler's GLBC business as offset by any claims GLBC may possess against Wholesaler, including those arising from a breach of this Agreement. The parties further recognize and agree that the Reasonable Compensation for a termination of this Agreement without cause will be an amount equal to one times Wholesaler's gross profits earned through Wholesaler's sale of Products during the twelve complete calendar months preceding the month GLBC provided Wholesaler with its notice of termination. Nothing in this subparagraph gives Wholesaler any right to any compensation following a non-renewal or a termination under paragraphs 10(a), 10(b), 10(c) or 10(e), and GLBC's sole obligations upon a non-renewal or a termination under paragraphs 10(a), 10(b),

acknowledgment adds further support to the merits and seriousness of Plaintiff's

arguments that Sections 9(a) and 10(c)(v) are void and unenforceable under the

Act: If the Ohio Franchise Act voids one provision of the Franchise Agreement, it

is not inconceivable that another provision is likewise void.  In short, Plaintiff

need not prove its case in full at this stage.  Instead, it is enough that Plaintiff has

raised questions going to the merits that are serious and difficult enough to

support the grant of injunctive relief.  *Six Clinics Holding Corp., II v. Cafcomp*

*Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.1997).

Great Lakes next argues that *Jameson Crosse* is distinguishable because

the Transaction was not just a name change and simple stock transfer.  Instead,

Great Lakes insists that Glazer's Ohio (which was owned by Glazer's, Inc., a

Texas company) and Plaintiff (which is owned by Southern Glazer's, a Florida-

based company) are not the same entity, triggering an ownership change that

provides just cause to terminate under the Franchise Agreement and the Ohio

Franchise Act.  More specifically, Great Lakes argues that the Transaction

---

10(c) or 10(e) are those enumerated in section 11.  As a condition
precedent to any payment of Reasonable Compensation to
Wholesaler, Wholesaler must pay all outstanding debts owed to
GLBC for good[s] sold and delivered and provide a general release
to GLBC, any successor distributor(s) in the Territory, and any of
their respective affiliates, shareholders, directors, officers,
employees, agents and representatives.

Franchise Agreement PAGEID # 310, ECF No. 17-1.

impacted other brands distributed by other subsidiaries of Glazer's, Inc. Resp. 14–15, ECF No. 9; Great Lakes Closing Brief 7, ECF No. 14. Moreover, even if the "day-to-day people" at the Columbus Branch have remained the same, Great Lakes complains that Plaintiff uses a new website to process orders and that "important" and "strategic decisions for Plaintiff" are now made in Florida by a Florida-based company that does not include Glazer's, Inc.'s beer business and beer expertise. Resp. 14, ECF No. 9; Great Lakes Closing Brief 7, ECF No. 14. Great Lakes' arguments are not well taken.

As an initial matter, Great Lakes cites to no authority that using a new website establishes that Plaintiff transferred the franchise, triggering just cause to terminate the franchise. In addition, as Plaintiff points out, the distributor and its new parent in *Jameson Crosse* changed their distribution territories to avoid competing with each other, but "[o]therwise Jameson Crosse conducts business essentially the same as prior to the sale." *Jameson Crosse*, 917 F. Supp. at 522. Stated differently, the Northern District of Ohio did not find that this change, which did not stop distribution of Kendall-Jackson's brands in all of the same territories, constituted a transfer of the franchise.

Great Lakes' complaint that business decisions are now made in a different location is equally unavailing. In *Jameson Crosse*, the manufacturer similarly complained of a "distant location" of the office facilities and warehouses of the distributor that purchased all of Jameson Crosse's stock and complained

of the loss of "key personnel at Jameson Crosse following the purchase[.]"  *Id*. at

523.  That court nevertheless concluded that Jameson Crosse had not sold or

transferred the franchise and, therefore, the manufacturer's disapproval of the

sale was not a legal justification for terminating the franchise.  *Id*. at 525.  Under

this authority, Defendant has not shown that a change in location of where a

distributor's business decisions are made provides a manufacturer with just

cause to terminate a franchise.

Finally, Great Lakes argues that Plaintiff's alleged fraud provides just

cause for terminating the Franchise Agreement under the Ohio Franchise Act.

Section 9(a) required Glazer's Ohio to seek Great Lakes' consent for a change in

ownership and, if Glazer's Ohio failed to do so, Great Lakes could immediately

terminate under Section 10(c)(v).  The parties to the Franchise Agreement further

agreed in Section 12(b) that, to the best of their knowledge, the terms complied

with all applicable laws.  According to Great Lakes, Plaintiff now takes the

opposite position when it argues that Sections 9(a) and 10(c)(v) are void and

unenforceable under the Ohio Franchise Act.  Great Lakes, however, relied on

Glazer's Ohio's agreement to the terms in the Franchise Agreement and

represents that it would not have entered into that agreement if it knew that

Glazer's Ohio or its successors never intended to honor its contractual

obligations.  Great Lakes takes the position that Glazer's Ohio fraudulently

induced Great Lakes to enter into the Franchise Agreement and therefore

breached its duty of good faith under the Ohio Franchise Act. This Court disagrees. As Plaintiff points out, the plain language of O.R.C. § 1333.83 voids any provision of a franchise agreement that waives or fails to comply with the Ohio Franchise Act. In other words, the Ohio legislature anticipated that parties may agree to contractual provisions that conflict with the Ohio Franchise Act and, under those circumstances, the Act will prevail. Accordingly, the Court is not persuaded that Plaintiff (or Glazer's Ohio) fraudulently induced Great Lakes into entering the Franchise Agreement providing just cause to terminate the franchise. Indeed, counsel for Great Lakes at the Hearing admitted that Great Lakes itself had drafted the Franchise Agreement.

For all of these reasons, the Court finds that Plaintiff has raised serious questions going to the merits of its claims as to whether Great Lakes' attempted termination violated the Ohio Franchise Act, which justify the issuance of a preliminary injunction. *Six Clinics Holding Corp.*, 119 F.3d at 402.

**B.      Irreparable Injury to Plaintiff**

The Court next considers whether Plaintiff would suffer irreparable harm without the requested injunction. When determining this factor, "[s]uch harm must be 'likely,' not just possible." *Tri-Cty. Wholesale Distributors, Inc. v. Wine Grp.*, Inc., No. 10–4202, 565 F. App'x 477, at *482 (6th Cir. June 29, 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not

fully compensable by monetary damages." *Id*. (citations and internal quotation marks omitted). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id*. at *483 (citations and internal quotation marks omitted).

After reviewing the arguments of the parties, relevant case law, and evidence, this Court is persuaded that Plaintiff will likely suffer irreparable harm without the requested injunction. First, this Court has previously found a risk of irreparable harm to a distributor where no other available brand could replace the manufacturer's brands following a termination. *See*, *e.g.*, *Hill Distrib. Co. v. St. Killian Importing Co., Inc.*, No. 2:11–cv–706, 2011 WL 3957255, at *4–5 (S.D. Ohio Sept. 7, 2011). In that case, the manufacturer's brands comprised only a small percentage—.51% to .54%— of the distributor's business. *Id*. at *4. Here, the record reflects that the Great Lakes brands are unique and comprise a significant part of Plaintiff's sales: Over the last twelve months, sales of Great Lakes brands totaled over 25% of all beer by revenue in the Columbus Branch and over 4% of the Columbus Branch's total revenue. Roberts Decl. ¶¶ 9, 15, ECF No. 3-2.

Great Lakes attempts to distinguish *Hill Distributing Co.* because that case did not have a written agreement with a provision providing a monetary remedy ("Reasonable Compensation") for termination like Section 10(d) of the Franchise Agreement. Great Lakes explains that it and Glazer's Ohio agreed between

themselves that money would compensate Glazer's Ohio in the event of a termination.  Great Lakes therefore argues that any alleged injury to Plaintiff is not irreparable.  This Court disagrees.

Section 10(d) recognizes that "it would be extremely difficult to ascertain the actual economic effects" of a termination without cause.  Where the nature of the loss is difficult to calculate, however, the injury is irreparable.  *Tri-Cty. Wholesale Distribs.*, 565 F. App'x 477, at \*482.  Moreover, Section 10(d) does not address injury to goodwill, which this Court has considered when finding a risk of injury irreparable.  *See, e.g., Hill Distrib. Co.*, 2011 WL 3957255, at \*4–5; *Tri-Cty. Wholesale Distribs.*, 565 F. App'x 477, at \*483 ("'[T]his court has recognized that a loss of business goodwill may constitute irreparable harm because of the difficulty in calculating damages.'") (quoting *Langley v. Prudential Mortg. Capital Co., LLC*, 554 F.3d 647, 649 (6th Cir.2009)).  Here, Plaintiff avers that loss of the unique Great Lakes brands would damage its goodwill by impairing Plaintiff's relationships with its retailers, negatively impact the sales of its other products, and erode its customer base.  Roberts Decl. ¶¶ 12–15.  While Great Lakes contends that such evidence is speculative, the Court finds the record sufficient to establish a risk of irreparable harm to Plaintiff without the requested injunction.  *See Hill Distrib. Co.*, 2011 WL 3957255, at \*4–5; *Tri-Cty. Wholesale Distribs.*, 565 F. App'x 477, at \*483.

Finally, Great Lakes argues that "Plaintiff sat on its hands and waited until the eleventh hour so it could claim it was facing imminent irreparable harm. Plaintiff cannot capitalize on its own delay." Great Lakes' Closing Brief 5, ECF No. 14. As set forth above, however, Plaintiff believed that the parties had agreed to a standstill pending the parties' settlement discussions. Based on the present record, the Court is not persuaded that Plaintiff unreasonably delayed in filing its motion. Accordingly, the present record reflects a risk of irreparable harm to Plaintiff.

**C.    Injury to Third Parties**

The third factor to consider is whether an injunction would substantially harm third parties. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). Great Lakes argues that "the issuance of an injunction may serve to force it into a new franchise agreement" to the detriment of Great Lakes. Great Lakes Closing Brief 9–10, ECF No. 14. In support, Great Lakes cites to O.R.C. § 1333.83, which provides that a franchise relationship is established by operation of law when a distributor distributes beer "for ninety days or more without a written contract[.]" According to Great Lakes, the ninety days expires on September 28, 2016. *Id*. This Court disagrees. The written Franchise Agreement between the parties is currently operative. *See*, *e.g.*, *Bellas Co. v. Pabst Brewing Co.*, No. 2:10-CV-907, 2011 WL 883154, at *6 (S.D. Ohio Mar. 11, 2011) (rejecting the argument that a franchise agreement is not binding on the parties after a

complete change in a party's ownership), *aff'd*, 492 F. App'x 553 (6th Cir. 2012).

While Great Lakes previously gave notice of its intent to terminate the Franchise

Agreement effective September 25, 2016, an injunction would require the parties

to continue to operate under that agreement. Under those circumstances, the

automatic provision in O.R.C. § 1333.83 is not applicable.

Great Lakes, however, contends that even if § 1333.83 does not apply, it

"will lose its contractual and statutory rights to consent to the change of

ownership and will be stuck with a distributor it did not choose and that lacks

beer focus, experience, and expertise." Great Lakes Closing Brief 10, ECF No.

14. For the reasons previously discussed, the present record does not persuade

this Court that the Transaction constituted just cause for Great Lakes to

terminate the Franchise Agreement. Accordingly, enjoining Great Lakes from

terminating that agreement in the absence of just cause does not show a risk of

substantial harm to Great Lakes. While Great Lakes may be unhappy with

Plaintiff as its distributor, Great Lakes' belief that another distributor is preferable

does not demonstrate substantial harm. *Cf.* Dayton Heidelberg Distrib. Co. v.

Vitners Int'l Co. of New York, No. C-3-87-436, 1991 WL 1119912, at *8 (S.D.

Ohio Apr. 8, 1991) ("[J]ust cause must mean something more than a

manufacturer's unilateral determination that it could make more money if a

franchise were terminated."). In short, the lack of harm to third parties weighs in

favor of granting the requested injunction.

## D.    Public Interest

Finally, the Court considers whether the requested injunction serves the public interest.  Great Lakes argues that the public has an interest in upholding parties' contractual obligations and warns that the public will lose faith in legal principles surrounding contract formation if the Court permits Plaintiff to disregard its contractual promises.  This Court agrees that holding parties to their written contractual obligations serves the public interest.  However, the Court also agrees with Plaintiff that recognizing and supporting the procedural protections in the Ohio Franchise Act serves the public interest.  This factor is therefore neutral.

## E.    Balancing the Preliminary Injunction Factors

In considering all of these factors, the Court finds that three out of the four factors weigh in favor of issuing the requested injunction.  While the public interest is neutral, Plaintiff has a likelihood of success on the merits and may suffer irreparable harm in the absence of an injunction.  Finally, the present record does not persuade this Court that third parties, including Great Lakes, will suffer substantial harm if an injunction is issued.

## F.    Bond

Under Federal Rule of Civil Procedure, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ.

P. 65.(c). "The amount of security required and whether a bond is needed is up to the discretion of the district court." *Bunn Enters., Inc. v. Ohio Operating Engineers Fringe Ben. Programs*, No. 2:13-CV-357, 2013 WL 3147956, at *15 (S.D. Ohio June 19, 2013), aff'd, 606 F. App'x 798 (6th Cir. Apr. 1, 2015).

In the case presently before the Court, Great Lakes will continue to receive profits under the Franchise Agreement from Plaintiff's sales of Great Lakes brands. Under these circumstances, the Court finds a nominal bond is sufficient.

## IV.  CONCLUSION

For all of these reasons, Plaintiff's motion, ECF No. 3, **GRANTED**. Plaintiff is **ORDERED** to post with the Court a bond in the amount of $1000, no later than September 30, 2016. Based on present record, *cf. Anderson v. Kelley*, No. 92-6663, 12 F.3d 211, at *5 (Table) (6th Cir. Dec. 15, 1993), it is further **ORDERED** that Great Lakes is preliminarily enjoined from the following:

1. Terminating, altering, or otherwise interfering with its franchise relationship or contract with Plaintiff;

2. Withholding the delivery of beverages ordered by Plaintiff;

3. Changing or altering Plaintiff's exclusive sales territory; and

4. Taking any action to appoint any person or entity as a distributor to replace Plaintiff in its exclusive sales territory.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**